## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT RAY ELDRIDGE, | § | |
| **Plaintiff,** | § | |
| v. | § | Civil Action No. 3:22-CV-00558-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Supplemental Security Income (SSI) under Title XVI of the Social Security Act is **REVERSED in part,** and the case is **REMANDED** for reconsideration.

### I.   BACKGROUND

Robert Ray Eldridge (Plaintiff) filed his application for SSI on November 5, 2019, alleging disability beginning on October 28, 2019. (doc. 8-1 at 179.)[2] His claim was denied initially on December 5, 2019, and upon reconsideration on October 6, 2020. (*Id.* at 76-84, 86-96.) After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a hearing on April 28, 2021, which was held by telephone due to the extraordinary circumstances presented by the coronavirus pandemic. (*Id.* at 56.) On June 30, 2021, the ALJ issued a decision finding him not disabled. (*Id.* at 24.) On July 9, 2021, Plaintiff timely appealed the ALJ's decision to the Appeals Council, and submitted new evidence, including medical records from his provider

---

[1] By consent of the parties and order filed May 27, 2022 (doc. 10), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

dated between December 15, 2020, and September 12, 2021. (*Id.* at 168.) The Appeals Council denied his request for review on January 13, 2022, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 4-5.) The Notice of Appeals Council Action explained that the new evidence did not show "a reasonable probability that it would change the outcome of the ALJ's decision" or that it "relate[d] to the period at issue" and affected the decision about whether he was disabled beginning on or before June 30, 2021. (*Id.* at 5.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on June 9, 1971; he was 49 years old on the date he filed his application on November 5, 2019.  (doc. 8-1 at 59, 179.) He had a high school education, could communicate in English, and had no past relevant work. (*Id.* at 59, 68, 192.)

**B.  Medical Evidence**

When he was 8 months old, Plaintiff suffered extensive burns to the left side of his body during a house fire; he lost his left ear and left forearm. (*Id.* at 261, 331, 343.) He began having seizures by age 8 and took phenytoin (PHT)[3]. (*Id.* at 43, 331, 343, 351.) Between 2004 and 2013, he was diagnosed with type 2 diabetes, hyperlipidemia, and hypertension. (*Id.* at 264-65, 270.)

*1.    Pre-hearing*

On April 3, 2019, while incarcerated in the Texas Department of Criminal Justice (TDCJ), Plaintiff underwent a psychological screening interview. (*Id.* at 52, 296-301.) He reported feeling "ok" and taking Dilantin[4] for epilepsy; he was found to not require further evaluation. (*Id.* at 296-

---

[3] PHT "has been the predominant medication for the treatment of epilepsy for over 7 decades." Rohit R. Das, et al., *The Role of Phenytoin in the Treatment of Localization Related Epilepsy: An International Internet-Based Survey of Neurologists and Epileptologists*, ISRN Neurology 1 (2013), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC3713315/pdf/ISRN.NEUROLOGY2013-613456.pdf.

[4] PHT is "marketed under the trade-name Dilantin". *Id.*

301.) Six days later, Plaintiff submitted to an intake physical exam by physician assistant Laura P. Floersch, PA (PA Floersch) at TDCJ's John Middleton Unit. (*Id.* at 261-63.) He had a blood pressure of 168/103, weighed 200 pounds, had a BMI of 26, and wore glasses for "vision correction", but had an otherwise normal evaluation with all extremities and joints, squatted "well", and had straight spine with full flexion. (*Id.* at 261.) He had "missed 2 doses" of his hypertension medication and was 33 percent compliant with PHT; his last seizure had been a year earlier. (*Id.*) He was assigned the following PULHES classification:

> P3MP =  physical capability: one or more medical conditions or deficits require significant activity limitations or accommodations, multiple codes, permanent;
> U3KP =  upper extremity: one or more medical conditions or deficits require significant activity limitations or accommodations, no work assignment requiring excessive exposure to sunlight or high environmental limitations, permanent;
> L3KP =  lower extremity: one or more medical conditions or deficits require significant activity limitations or accommodations, no work assignment requiring excessive exposure to sunlight or high environmental limitations, permanent;
> H1AP =  hearing and ears: all systems in th[is] category are normal, no assignment limitations, permanent; and
> E2BP =  eyes and vision: some medical condition or deficit may require limitations; minor limitations in assignment, permanent.
> S =       [blank][.]

(*Id.* at 262.)[5]  She also "delete[d]" his limitations for working in "no humidity extremes". (*Id.*)

---

[5] "TDCJ inmates are classified for housing and work using the PULHES system", a numeric system the military established for rating a patient's health. *See Flowers v. Isbelle*, No. CIV.A. H-12-1165, 2012 WL 6099046, at *1 n.1 (S.D. Tex. Dec. 7, 2012) (citations omitted). PULHES is based on an evaluation of six different categories of body parts/systems—Physical Capability; Upper Extremities; Lower Extremities; Ears and Hearing; Eyes and Vision; and Mental Health, formerly "Psychiatric" (S)—a medical professional assigns a "number" to reflect "functional capacity" of that body part/system, a "code" to assess any work limitations, and a "modifier" to identify prognosis:

> 1 = All systems in that category are normal.
> 2 = Some medical condition or deficit may require limitations.
> 3 = One or more medical conditions or deficits require significant activity limitations or accommodations.
> 4 = Significant medical, physical or mental impairment and strict limitations in work, housing and unit assignment.
> …
> A = No assignment limitations
> B = Minor limitations in assignment
> C = No prolonged walking, no lifting more than specified pounds, restricted physical activity
> D = No exposure to heavy air pollutants. Restricted physical activity.

On April 16, 2019, Plaintiff was prescribed antibiotics for an infection and underwent a comprehensive metabolic panel (CMP). (*Id.* at 266.) He had blood pressure of 156/107, a BMI of 26, and a hemoglobin A1c (HgA1c) level of 6.3, and he had been 38.46 percent PHT compliant. (*Id.* at 281.) On April 23, 2019, he was evaluated for atherosclerotic cardiovascular disease (ASCVD)[6] risk, had a 29.3 percent risk of ASCVD, and was prescribed Lipitor. (*Id.* at 283-84.) His blood pressure was 118/84, he weighed 199 pounds, and his BMI was 26. (*Id.* at 283.)

On May 7, 2019, Plaintiff presented to TDCJ's Tulia Transfer Facility N3 (Tulia) for a "musculoskeletal symptoms" note. (*Id.* at 290-92.) He was ambulatory, weighed 201 pounds, had a BMI of 27 and blood pressure of 140/86, with no suspected fracture, normal joints, movement, gait, posture, and peripheral edema, as well as full range of motion in all extremities and neck and bilateral back lateral flexion. (*Id.* at 290-91.) He requested diabetic shoes due to daily "moderate" foot pain. (*Id.*) On June 6, 2019, Plaintiff had normal vital signs and again requested diabetic shoes

---

E = Restricted to lighter, slower activities.

G = No work assignment where sudden loss of consciousness would be dangerous or where awareness of environment is required in order to avoid injury.

K = No work assignment requiring excessive exposure to sunlight or high environmental temperatures.

M = Multiple codes, which the medical record should identify (e.g., P3MP, M = C&G).

N = No jobs requiring understanding of complex instructions.

P = Assignment only where secondary level medical care is available. Strict limitations to work assignment.

I = ["Currently housed in a Developmental Disability Program" and following specific treatments.]

…

D = Developmental disability …

R = Remedial …

T = Temporary …

P = Permanent … indicates that no significant change in condition is expected.

H = History ….

*See Policy A-08.7: PULHES System of Offender Medical and Mental Health Classification*, TDCJ Correctional Managed Health Care Policy Manual, https://www.tdcj.texas.gov/divisions/cmhc/cmhc_policy_manual.html (July 2021). A provider shall review the inmate's PULHES classification each time a medical/mental health decision is made about an inmate's current health status and functional level. *Id.*

[6] ASCVD is the buildup of cholesterol, fatty cells, and inflammatory deposits on the inner walls of arteries. *See What You Should Expect from Statin Therapy*, Cleveland Clinic (Jan. 6, 2020), https://health.clevelandclinic.org/what-you-should-expect-from-statin-therapy.

for daily but "mild" bilateral foot pain. (*Id.* at 293-95.)

The same day, Plaintiff had a virtual visit with Tulia's nurse practitioner Amanda C. Watson, NP (Nurse Watson) for a chronic care clinic note and individualized treatment plan. (*Id.* at 264-68.) His blood pressure was 140/86, he weighed 201 pounds, and his BMI was 27. (*Id.* at 264.) He reported no recent seizures; he had his first seizure in 2000, his last seizure in 2015, grand mal seizures for the first 3 or 4 years, and petite mal seizures after that. (*Id.* at 265, 267.) He had a normal examination, appeared in no acute distress, was alert and oriented times three, and was on statin therapy[7] for hyperlipidemia. (*Id.*) Nurse Watson "stressed better compliance" with his hypertension medication, extended his medication regimen, and advised weight loss and 30 minutes of aerobic exercise on "most" days. (*Id.*) She assessed him with "borderline" hypertension, hyperlipidemia, type 2 diabetes, epilepsy and recurrent seizures, and amputation; gave him a 6-month follow-up; and opined that he would not require "discharge planning" from continuity of care[8] prior to his release from TDCJ. (*Id.* at 267-68.) At another virtual visit with Nurse Watson on June 11, 2019, Plaintiff weighed 208 pounds and had a BMI of 28, blood pressure of 153/94, and "sub therapeutic" Dilantin levels despite 72.46 percent PHT compliance. (*Id.* at 285-87.) Nurse Watson affirmed his PULHES classification, opined that he would benefit from diabetic shoes that he still lacked, and gave him a 1-month follow-up. (*Id.*)

At a "chart review" by Nurse Watson on August 18, 2019, Plaintiff weighed 213 pounds, his blood pressure was 189/108 and his BMI was 28, and his PHT compliance was 86.86 percent.

---

[7] Statin therapy is using cholesterol-lowering medications to manage cardiovascular disease. Cleveland Clinic, *supra* note 6.

[8] Continuity of care is "[a] program designed to provide a responsive system for individuals discharging from TDCJ, local referrals from parole, jail, family and other related agencies." *Offender Orientation Handbook*, Tex. Dep't Crim. Just. 86 (Feb. 2017), www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf.

(*Id.* at 288-89.) On August 26, 2019, Plaintiff told Nurse Watson that his last seizure had occurred in January 2019 (not 2015, as previously stated), and that his nausea from earlier in the week had gone away. (*Id.* at 269-74.) He weighed 215 pounds and had blood pressure of 152/91, a BMI of 28, and a HgA1c level of 6.2. (*Id.* at 269.) He expressed his concern that Tulia lacked a 24-hour medical unit to treat his seizures, and Nurse Watson explained "in depth" that Tulia had policies to treat him if that occurred. (*Id.* at 270.) She adjusted his Dilantin and Lisinopril dosages to get them within "therapeutic range" and noted that he was in the climate-controlled unit and had no seizure activity. (*Id.* at 270, 273-74.) She again advised exercise and weight loss and deleted his PULHES limitations to not work in direct sunlight and to avoid extreme temperature and humidity. (*Id.* at 273.) She gave him a 1-month follow-up and diagnosed him with hyperlipidemia, hypertension, epilepsy and recurrent seizures, and absence of limb, acquired (amputation). (*Id.* at 274.) Benjamin J. Leeah, M.D. (Internist), and Nurse Watson signed the treatment note. (*Id.*)

At a virtual visit with Nurse Watson on September 16, 2019, Plaintiff reported improved compliance and feeling "much better" and in a "good mood". (*Id.* at 275-79.) He weighed 215 pounds and had a BMI of 28, HgA1c level of 6.2, and blood pressure of 166/112 at the first reading and 150/100 on a second reading. (*Id.* at 275.) He was 90.91 percent compliant with Lisinopril and 93.18 percent with PHT[9]. (*Id.*) She confirmed his prior PULHES classification, again advised exercise and weight loss, and continued his diagnoses but added type 2 diabetes. (*Id.* at 278-79.)

After his release from TDCJ on October 28, 2019, Plaintiff completed a function report on November 20, 2019. (*Id.* at 52, 200-07.) He reported phantom pain, seizures, "very high" blood pressure, and cramping in his only hand. (*Id.* at 200-02.) He lived with friends who cooked "a lot"

---

[9] Plaintiff's clinic note indicated his PHT level had consistently increased in 2019: 3.5 on June 4, 2019, 5.2 on July 9, 2019, 7.9 on August 20, 2019, and 9.3 on September 12, 2019. (doc. 8-1 at 278.)

for him because he only had one arm and could not hold pots or pans. (*Id.*) He had trouble dressing, bathing, and doing house chores, and he needed reminders to take his medication. (*Id.*) He did not drive due to vision problems, so he got around by walking and using public transportation; he went out alone, handled his own finances, shopped in stores, and went to church, a community center, and parks every week. (*Id.* at 203, 205.) His medical conditions affected his ability to lift, stand, reach, hear, see, climb stairs, and use his hand; he could walk about 20 yards before he needed to stop and rest for 5 to 10 minutes. (*Id.* at 204.) He could pay attention "most of the time", follow written and spoken instructions "very well", and handle stress "pretty good". (*Id.* at 204, 206.) He could not remember when he was prescribed an artificial limb and glasses, but he needed them "ASAP". (*Id.* at 206.) He had side effects secondary to medications: dizziness (amlodipine), dry mouth (guanfacine), light headedness (lisinopril), upset stomach (metformin), and headaches (PHT). (*Id.* at 207.)

On December 4, 2019, state agency medical consultant (SAMC) Patty Rowley, M.D., completed a physical RFC assessment based on a review of Plaintiff's record. (*Id.* at 76-84.) She noted that he alleged disability based on left amputated arm, high blood pressure, seizures, and diabetes. (*Id.* at 76.) She also noted his normal CMP and HgA1c level of 6.2 in April 2019, and his blood pressure of 166/112, normal physical examination, and diagnoses of hypertension, hyperlipidemia, diabetes, and seizures in September 2019. (*Id.* at 78.) She opined that a consultative examination was not required and that his alleged limitations were "partially supported" by the evidence of record. (*Id.* at 78, 82.) She found that his burns were a severe impairment, and his diabetes and essential hypertension were non-severe. (*Id.* at 79.) SAMC Rowley opined that Plaintiff had the physical RFC to perform medium exertional work, limited to lift and/or carry and push and/or pull with the right hand 20 pounds occasionally and 10 pounds

frequently; stand and/or walk about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; and balance, kneel, crouch, and climb ramps or stairs without limits, but never crawl, climb ladders, ropes, or scaffolds, or handle, finger, feel, or reach with the left hand; he had no visual, communicative, or environmental limitations. (*Id.* at 79-81, 83.) She found that Plaintiff had no past relevant work; a significant number of jobs that he could perform existed in the national economy such as escort (DOT 359.367-010)[10], chaperone (DOT 359.667-010), and page (DOT 353.367-022); and that he was not disabled. (*Id.* at 83.)

On December 20, 2019, Plaintiff presented to Parkland Health and Hospital System (Parkland) to "establish care" and was examined by Latasha Pittman, APRN, FNP (Nurse Pittman). (*Id.* at 304-07.) He had a normal physical examination with normal range of motion, and he denied any constitutional, respiratory, cardiovascular, gastrointestinal, genitourinary, or neurological pain. (*Id.* at 305-06.) He had blood pressure of 154/100, weighed 217 pounds, was 73 inches tall, and had a BMI of 28.8. (*Id.* at 306.) He was assessed with neuropathy, hypertension, seizure, type 2 diabetes, and hyperlipidemia. (*Id.*) He submitted to laboratory testing, was given a 3-week follow-up, and was advised to take his medication as directed, exercise regularly, and avoid fried foods. (*Id.* at 306-07.) His HgA1c level was 6.1. (*Id.* at 334.)

On January 15, 2020, Plaintiff returned to Parkland for a blood pressure check. (*Id.* at 303-04.) He had been medication compliant and had taken his hypertension medication at 7 o'clock that morning; his blood pressure reading of 169/97 was sent to Nurse Pittman for review. (*Id.*) On February 19, 2020, he returned to Parkland for a blood pressure check. (*Id.* at 303.) He had been medication compliant and had taken his hypertension medication at 8 o'clock that morning, but his blood pressure was 186/108, and he reported headaches, tiredness, and fatigue. (*Id.*)

---

[10] DOT stands for Dictionary of Occupational Titles.

On March 10, 2020, Plaintiff completed a second function report. (*Id.* at 220-27.) He reported that he had only one arm and felt a lot of pain in it, his seizures were "bad", his blood pressure was at stroke level, and his vision was "bad". (*Id.* at 220.) His medical conditions, including in his left side and back, affected his ability to lift, squat, bend, stand, walk, kneel, climb stairs, see, and use his hand; he used a back brace and glasses. (*Id.* at 225-26.) He had difficulty dressing, cooking, and bathing, and he could not walk because his foot hurt from his diabetes or stand "long times" due to dizziness. (*Id.* at 220-22.) He had trouble concentrating, could pay attention for about 30 minutes, and was "okay" in following written and spoken instructions. (*Id.* at 225.) He did not drive, got around by riding in a car, and never went out alone due to seizures and the possibility of falling; he read "all the time", spent time with others about once every 90 days, and went to church and "family groups" around three times a year. (*Id.* at 223-24.) He handled his own finances and shopped by computer once a month. (*Id.*) He placed a checkmark beside "yes" to indicate that he was taking medication but did not list any, and he placed a checkmark beside "no" to deny any medication side effects. (*Id.* at 227.)

In a virtual visit with Parkland on May 20, 2020, Plaintiff was examined by physician assistant-certified Edith A. Hawkins-Frost, PA-C (PA Hawkins-Frost), for management of hypertension and type 2 diabetes. (*Id.* at 332-35.) He reported having no blood pressure monitor and that his home glucose levels had been between 197 and 200; he requested a medication refill, a replacement glucometer, and medical forms for disability, food stamps, and handicap parking. (*Id.* at 333.) He reported seizures since childhood due to multiple surgeries and anesthesia, but denied seizures for two years or treatment by Parkland's Neurology department. (*Id.*) He was diagnosed with vitamin D deficiency, hyperlipidemia, type 2 diabetes, hypertension, and seizure. (*Id.*) His medications were refilled. (*Id.* at 333-34.) PA Hawkins-Frost ordered laboratory testing

and a brain magnetic resonance imaging (MRI), noted his December 2019 HgA1c level of 6.1, recommended hemoglobin electrophoresis testing for the "possible" presence of a variant hemoglobin, and gave him a neurology referral, a blood pressure check in no more than 2 weeks, and a 4-month follow-up. (*Id.* at 334.) She specifically stated that she was unable to complete the handicap parking form because she had not physically evaluated him. (*Id.*)[11]

On July 21, 2020, Plaintiff presented to Parkland for management of his seizures. (*Id.* at 331-32, 351-52.) He reported amnestic seizures that presented with an "aura" of nausea, blacking out, and "shaking" of his whole body. (*Id.* at 331-32, 351-52.) His seizures had decreased from twice weekly to 2 or 3 times yearly since adjusting his medication. (*Id.*) Based on a personal evaluation by Rabia Jamy, M.D. (Epilepsy Fellow), Kan Ding, M.D. (Neurologist) found that Plaintiff had no prior "workup", had been on PHT for 40 years, was taking 300 milligrams twice a day, and had experienced seizures since he was 8 years old. (*Id.*) Neurologist assessed him with "seizure disorder with unknown etiology", ordered a PHT level check and continuation of his medication regimen, and agreed with Epilepsy Fellow's finding regarding his "EEG and MRI for seizure classification". (*Id.*) Plaintiff's PHT level was less than 1.8, and he had blood pressure of 181/96, weighed 181 pounds, was 6 foot and 1 inch tall, and had a BMI of 23.88. (*Id.* at 355, 360.)

On August 20, 2020, an MRI of Plaintiff's brain revealed:

1. Asymmetric prominence of the right lateral ventricle without hydrocephalus, obstructive lesion …, or other structural abnormality, likely developmental.
2. No evidence of structural brain abnormalities to account for [Plaintiff]'s reported seizures.
3. Chronic microvascular ischemic white matter changes.

(*Id.* at 43, 355.) Hippocampi and mesial temporal lobe structures, as well as midline structures,

---

[11] Plaintiff reported that, on an undisclosed date, he had visited the emergency room (ER) for "uncontrolled" hypertension and was treated with Clonidine; no medical records could be located per PA Hawkins-Frost. (doc. 8-1 at 333.)

were within normal limits. (*Id.* at 354.)

On September 28, 2020, Plaintiff presented to Fort Worth Internal Medicine for a consultative physical examination by Adebola Olatunji, M.D. (Examiner). (*Id.* at 342-44.) He reported high blood pressure, diabetes, seizures, and prior surgeries on his head and left arm. (*Id.* at 342.) The whole left side of his body, including his face and neck, suffered burns in a fire when he was 8 months old, his left arm was amputated below the elbow, and he had trouble finding a job despite being right-handed. (*Id.* at 343.) He also reported that his first seizure occurred at the age of 7, his "absent" seizures had developed into "Grand Mal" seizures, and they presented with jerky movements, urinary incontinence, and loss of consciousness, but no tongue biting. (*Id.*) He had experienced 5 seizures the year before, his last seizure had occurred a week earlier while he was in a car, and he had suffered some bruises to his face. (*Id.*) Plaintiff denied any cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, neurologic, or hematologic-lymphatic pain. (*Id.*) His blood pressure was 161/104, he weighed 176 pounds and was 73 inches tall, and his BMI of 23.22 was noted as "[h]ealthy [w]eight". (*Id.*) He had "multiple" burn scars "predominantly" on the left side of his body and his left arm "stump" was "well healed"; he "independently" climbed onto and off the examination table and walked unassisted but he was unable to tandem walk. (*Id.*) He had normal gait, no abnormal movements, normal muscle tone and bulk, normal sensation, power 5/5 in all limbs, and normal back curvature, but mild tenderness on palpation of right paraspinous group of muscles in upper lumbar area. (*Id.* at 343-44.) Examiner diagnosed him with left below elbow forearm amputation, severe burn wound scars on the left side of his body, and epileptic seizures. (*Id.* at 344.)

On October 1, 2020, SAMC Roberta Herman, M.D., completed a physical RFC assessment based on a review of Plaintiff's record. (*Id.* at 86-96.) She noted his allegation that his medical

conditions had worsened around December 1, 2019, and denial of any new conditions. (*Id.* at 87.) She opined that a consultative examination was required because the evidence "as a whole, both medical and non-medical" was not sufficient to support a decision on the claim. (*Id.* at 90.) She considered Plaintiff's physical examination days earlier, which reflected his burn scars, left forearm amputation, inability to tandem walk, normal gait, 5/5 muscle strength in all extremities, mild tenderness to palpation on right paraspinous group of muscle in upper lumbar area, and straight leg raise at 90 degrees. (*Id.*) She found Plaintiff's burns and amputation were both severe impairments. (*Id.*) She affirmed SAMC Rowley's physical RFC assessment but opined that Plaintiff could perform light (not medium) exertional work. (*Id.* at 95.) She also opined that he had environmental limitations, such as avoiding "concentrated exposure" of extreme cold, heat, wetness, humidity, noise, pulmonary irritants and avoiding "all exposure" to "hazards (machinery, heights, etc.)", specifically "unprotected heights, open bodies or containers of water or other liquids, open flame or sources of high temperatures." (*Id.* at 91-93.)

On December 15, 2020, Plaintiff had a virtual visit with Epilepsy Fellow for management of his seizures. (*Id.* at 42-44, 349-50.) He reported that his amnestic seizures were "much worse" than in July 2020 and had included a couple of "full body" convulsions lasting 5 minutes and at least 5 blackouts lasting 3 to 4 minutes.[12] (*Id.* at 43, 349.) They presented with tightening of bilateral leg muscles, blurred vision in both eyes for a few minutes, headaches in the back of his head/neck, tiredness, and "affected" hearing. (*Id.*) His HgA1c level was 6.1 and his PHT level of 1.8 was "subtherapeutic" despite his reported medication compliance. (*Id.*) Epilepsy Fellow considered his most recent work-up, including his August 2020 MRI findings and an electroencephalogram (EEG) that was "normal awake/sleep". (*Id.* at 43, 349, 355.) She gave him

---

[12] Plaintiff reported that his last convulsion had occurred 2 weeks earlier. (doc. 8-1 at 349.)

a three-month follow-up, advised safety precautions such as not driving, recommended an epilepsy monitoring unit (EMU) for "characterization" if "frequent" spells persisted, prescribed Keppra, and instructed him to discontinue PHT after taking Keppra for 2 weeks. (*Id.* at 43-44, 350.) Rodrigo Zepeda, M.D. (Neurology Specialist), signed the treatment note and expressly agreed with Epilepsy Fellow's findings and recommendations. (*Id.* at 42, 350.)

On March 29, 2021, Plaintiff called Parkland to request a primary care appointment for a follow-up and referrals. (*Id.* at 348.) On April 9, 2021, his HgA1c level was 5.6. (*Id.* at 46.)

    2.    *Post-hearing*

On May 4, 2021, Plaintiff presented to Epilepsy Fellow at Parkland for management of seizures. (*Id.* at 45-51, 55.) His PHT levels were subtherapeutic despite reported compliance, and his last seizure occurred 1 or 3 weeks earlier. (*Id.* at 46-47.) Although he reported being unaware that he had been prescribed Keppra in December 2020, the medical records showed that he had picked it up on December 16, 2020. (*Id.* at 47.) Epilepsy Fellow noted that Plaintiff's seizure frequency had "relatively" improved with Dilantin, from 3 to 5 per month to 1 per month. (*Id.* at 46.) She again advised EMU for "characterization" but opined that it was "reasonable" for him to try another anti-epileptic drug, or AED. (*Id.*) She again prescribed Keppra, instructed him to discontinue PHT after taking Keppra for 2 weeks, and proscribed driving for at least 3 months, given his recent seizure. (*Id.* at 46-47.)

On May 13, 2021, Plaintiff presented to Parkland Sleep Center for an obstructive sleep apnea evaluation. (*Id.* at 31-41.) He denied using any sleep aids, complained of "[i]ncreased" snoring, "unrefreshed" sleep, difficulty falling asleep and staying asleep, and fatigue; he reported witnessed apneas for more than 10 years and seizure activity the prior month. (*Id.* at 31-32.) He endorsed a "little" difficulty watching a movie and "extreme" difficulty being active in the morning

due to sleepiness or tiredness. (*Id.* at 34.) He was positive for congestion, claudication and leg swelling, falls, myalgias, back, joint, and neck pain, dizziness, tremors, sensory change, speech change, focal weakness, seizures, and headaches. (*Id.* at 36-37.) His blood pressure was 157/88, his BMI was 24.7, he weighed 186 pounds, and he had a normal physical examination, including normal range of motion and heart rate and rhythm. (*Id.* at 37.) He was assessed with "[p]ossible [obstructive sleep apnea] symptoms", referred for a home sleep apnea study, and advised not to drive. (*Id.* at 39.) He was also diagnosed with obstructive sleep apnea, insomnia due to medical condition, vitamin D deficiency, hypertension, hyperlipidemia, seizure, and type 2 diabetes without complication, without long-term current use of insulin. (*Id.*)

On September 12, 2021, Plaintiff presented to Parkland Memorial Hospital for a lumbar spine MRI, which revealed "[m]ultilevel degenerative changes of the lumbar spine", findings that were "most prominent" at L4-5 and L5-S1, and stenosis of the left neural foramina at L4-5 and L5-S1 with contact of the exiting left L4 and left L5 dorsal nerve root ganglia. (*Id.* at 29-30.)

## C. April 28, 2021 Hearing

On April 28, 2021, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 55-75.) Plaintiff appeared personally without representation by an attorney or a non-attorney representative.[13] (*Id.* at 55-56.)

### 1. Plaintiff's Testimony[14]

Plaintiff testified that he was born on June 9, 1971, and he had obtained a GED. (*Id.* at 59.) Since January 2021, he had been employed by All City Management Service as a school crossing

---

[13] After the ALJ noted that Plaintiff was present but was not represented, he informed Plaintiff of his rights to representation, and Plaintiff responded, "I want to go ahead and represent myself." (doc. 8-1 at 55-56.)

[14] Before he testified, Plaintiff stated he had no objections to the exhibits admitted into evidence but noted that Examiner determined that his vision was "right" but "never" tested it. (*Id.* at 57.)

guard for $10.25 an hour; he worked about 10 hours a week, from 7:00 a.m. until 8:00 a.m. and from 3:00 p.m. until 4:00 p.m. (*Id.* at 59-60.) He got the job through his sister, who had the job and knew he needed "some type of income". (*Id.* at 60.) It was a "strenuous" job at times due to his "bad" back and leg and because he had to go "up and down". (*Id.* at 60-61.) Although it was the longest employment he had ever had, he was claiming disability because he could not "really survive" off that job. (*Id.* at 60.) It was also hard for him to find a long-term job with his conditions, including high blood pressure and seizures, which required him to avoid exposure to chemicals, direct sunlight, machines, and moving parts. (*Id.*) He had tried "all kind[s] of things", but "[he] never last[ed] long", at most maybe a month or two. (*Id.*)

Plaintiff's two main issues were seizures and high blood pressure. (*Id.* at 61.) Since his December 2020 seizure, he had another seizure in March 2021, while he was home; he was taken by ambulance to Methodist Hospital but was discharged less than two hours later. (*Id.* at 62.) He consented to release of those treatment records so they could be added to the record. (*Id.* at 66-67.) Despite his compliance with Keppra, his levels were low, so his dosage was increased from 100 milligrams three times a day to 600 milligrams three times a day. (*Id.* at 62-63.) He planned to tell his doctor at his next appointment that the new dosage made him feel "jumpy", "trembly", "shaky", "jittery", and like his nerves were "bad". (*Id.* at 64.) He had taken Dilantin in the past, but "after a while" it no longer "d[id] a lot for [him]". (*Id.*)

A week earlier, Plaintiff's blood pressure had been 185/110 despite his medication compliance. (*Id.* at 61.) He had tried to "work" with his increased dosage, but it made him dizzy and did not allow him to "really do much". (*Id.*) After asking his doctor for referrals, he was scheduled for a sleep study on May 13, 2021, and a second visit with Neurologist. (*Id.*)

Plaintiff lived with his girlfriend, who worked. (*Id.* at 64-65.) He mostly stayed home

during the day, took out the trash, mopped, and swept "a little bit every now and then"; he did not

cook because he could not hold pots. (*Id.*) He had re-applied for the SSI benefits he had received

since around 1972, when he got burned; he lost them while he was incarcerated. (*Id.* at 61-62.)

Although a physical examination showed his vision was unlimited, Plaintiff stated that he

could "hardly" see "good at all" and needed glasses. (*Id.* at 61.) He referenced his TDCJ medical

records to show his eyesight had been tested and he had been prescribed glasses, even if he never

received them because he was released before they were picked up,   and the facility was too far

away for him to do that. (*Id.* at 65-66.) Since he lacked insurance and "finances" to buy prescription

glasses, he used "readers". (*Id.* at 66.) He had started to receive care at Parkland, including

laboratory testing, a primary care appointment, and neurology and sleep apnea referrals. (*Id.*)

Plaintiff was right-handed and was able to lift 10 pounds at most because anything heavier

than that would require him to use two hands. (*Id.* at 65, 69-70.)

*2.   VE's Testimony*[15]

The VE first considered a hypothetical individual of Plaintiff's age and education who

could perform light exertional activity, i.e., lift and/or carry 20 pounds occasionally and 10 pounds

frequently; sit for 6 hours during the workday; stand and/or walk for 6 hours during the workday;

push and pull as much as he could lift and/or carry; never use the left hand to handle, finger, and

feel, operate hand controls, and reach in all directions including overhead; never crawl, climb

ladders, ropes, and scaffolds; and never work at unprotected heights, move mechanical parts, and

operate a motor vehicle. (*Id.* at 68.)

At the ALJ's request, the VE then considered four light exertional jobs.[16] (*Id.* at 69-74.)

---

[15] At the outset, the ALJ announced he had found that Plaintiff had no past relevant work. (doc. 8-1 at 68.)

[16] The VE initially testified that "when one is working one handed, the pace of work is far less", but she

The VE testified that an escort (DOT 359.367-010, SVP-2)[17], of which there were 1,400 jobs nationally, performed occasional reaching, handling, and fingering, which the DOT typically considered as performed bilaterally, but she opined that the job could be performed one-handed. (*Id.* at 69-71.) In response to whether it required "much by way of lifting or carrying" or whether it was light because of the "long standing and walking", the VE testified that the escort job was defined as "driving visitors and industrial [sic], who are coming to certain destinations in industrial establishments" and "escorting somebody to an office [or] a department". (*Id.* at 73.) Noting that an escort was a "stand-alone occupation", the VE added, "[t]hat is what I'm questioning". (*Id.*) She opined that an employee who escorts visitors "might very well be" what a receptionist or another employee does "as part of [his] duties", which could include issuing visitor identification badges and safety devices or "collecting and delivering" messages and mail, the latter of which might require lifting and/or carrying more than 10 pounds. (*Id.*)

The VE next testified that the job of a page (SVP-2)[18], of which there were "no numbers nationally", performed "no more than occasional" bilateral reaching, handling, and fingering; she did not specify whether it could be performed one-handed. (*Id.* at 70.) She "sincerely doubted" that a page job existed in the national economy. (*Id.*)

The VE further testified that a chaperone (DOT 359.667-010, SVP-2), of which there were 1,900 jobs nationally and did not require any reaching, handling, or fingering, was defined as one

---

recalled Plaintiff's crossing guard job and stated, "I can bring that up." (doc. 8-1 at 68-69.) The ALJ informed her that it could not be considered because Plaintiff worked part-time in that position, but stated, "And just so you know, [VE], I'm going to—you may come up with jobs on your own or not, but there are some jobs that [the SAMCs] identified and I'm going to run those by you to see if, in your opinion, the person could perform these positions." (*Id.* at 69.)

[17] SVP stands for Specific Vocation Preparation.

[18] Although neither the ALJ nor the VE provided a DOT code for a page job during the hearing, (doc. 8-1 at 69-74), the SAMCs identified it as DOT code 353.367-022 (*id.* at 83, 95).

who "[c]haperones young people to social functions held in hotels or restaurants, greets guests, answers questions regarding programs, arranges for entertainment such as games, concert[s], motion pictures, asks guests to observe rules of establishment and report[s] to vendors [and] officer[s]" and "may collect tickets for admission to events". (*Id.* at 70-71.) While noting the job's consistency with the first hypothetical individual, she testified that she "really question[ed] whether it exists in the national economy", and that she didn't "think [she had] ever seen a job title for [chaperone] in terms of placement for purposes of placement." (*Id.*)[19]

Lastly, the VE testified that an usher job (DOT 344.677-014, SVP-2), of which there were 4,500 jobs nationally and which required occasional "manual dexterity", could be performed one-handed because it involved "more standing and walking" than "holding programs". (*Id.* at 73.)

The VE considered a second hypothetical individual with the same limitations as the first, except with a sedentary level of exertion for lifting and carrying. (*Id.* at 71.) He could not perform the non-sedentary jobs of escort, page, chaperone, or usher. (*Id.* at 71-72.) At the ALJ's request, the VE considered a surveillance system monitor (DOT 379.367-010, sedentary), of which there were 2,900 jobs nationally, which was classified as "unskilled". (*Id.* at 72-73.) Although it existed in the national economy, for example at casinos, the VE "did not consider" it performed at an unskilled level and opined that it "tend[ed]" to be "a little bit more semiskilled" (i.e., SVP-3 or SVP-4). (*Id.*) There were no sedentary jobs available to the second hypothetical individual without special accommodation, such as a one-handed keyboard or voice-activated software. (*Id.* at 72.)

The VE's testimony relied in part on the DOT. (*Id.* at 73-74.) Where it was "silent"—i.e., the limitation of reaching, handling, and fingering with one hand instead of two, the existence of

---

[19] In response to her testimony, the ALJ orally stated, "I mean, yeah, but we're familiar with people who, you know, ushers, and that kind of thing. I don't know if usher is the same thing or if it's different." (doc. 8-1 at 71.)

jobs in the current national labor market, and the way that surveillance system monitor jobs were currently performed—she had instead relied on her professional experience and on-site job analysis, labor market research, and job placement. (*Id.*)

## D.  **ALJ's Findings**

The ALJ issued an unfavorable decision on June 30, 2022. (*Id.* at 24.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since the application date of November 5, 2019. (*Id.* at 18.) At step two, he found that Plaintiff had the severe impairments of left arm amputation, seizure disorder, and hypertension, and the non-severe impairment of diabetes, and he did not have the medical determinable impairments of vision, sleep, or back issues. (*Id.* at 18-19.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925-416.926). (*Id.* at 19.) He expressly considered Listings 1.20 (amputation due to any cause) and 11.02 (seizures) in his findings. (*Id.*)

Next, the ALJ determined that Plaintiff retained the physical residual functional capacity (RFC) to perform less than the full range of light work, as defined in 20 C.F.R. § 416.967(b), i.e., lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit 6 hours in an 8-hour workday; push/pull as much as lift/carry; never crawl, climb ladders, ropes, or scaffolds; never use the left hand to handle, finger, feel, operate hand controls or reach in all directions (including overhead); and never work at unprotected heights, move mechanical parts, and operate a motor vehicle. (*Id.* at 19-20.) At step four, he determined that Plaintiff had no past relevant work. (*Id.* at 22.) At step five, the ALJ found that transferability of job skills was not an issue in the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education,

work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since his application was filed on November 5, 2019. (*Id.* at 23.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision.

*See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents the following issues for review:

1. The ALJ impermissibly relied on his own lay interpretation of the medical evidence to develop an RFC that is unsupported by substantial evidence.

2. The ALJ's failure to develop the record and order a consultative examination was prejudicial error because the examination would have provided the evidence that Plaintiff suffered from impairments that the ALJ excluded from the RFC analysis, reasoning that there was insufficient evidence to find that they were medically determinable impairments.

(doc. 14 at 1.)

### A.  *Ripley* **Error**

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *See* 67 F.3d at 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination

22

was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform less than the full range of light work, as defined in 20 C.F.R. § 416.967(b), i.e., lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit 6 hours in an 8-hour workday; "push/pull" as much as lift/carry; never crawl, climb ladders, ropes, or scaffolds; never use the left hand to handle, finger, feel, operate hand controls or reach in all directions (including overhead); and never work at unprotected heights, move mechanical parts, and operate a motor vehicle. (doc. 8-1 at 19-20.)

The ALJ considered Plaintiff's left forearm amputation due to a house fire when he was 8 months old, seizures since childhood, diagnoses of hypertension and diabetes prior to the relevant period, and alleged problems with sight, sleep, and his back. (*Id.* at 18-19 (citing *id.* at 200-07, 260-328, 331-35, 341-63).) Although Plaintiff had reported phantom pain related to his left forearm amputation (*id.* at 201), the ALJ found that "acute complaints and clinical deficits" were absent from the record (*id.* at 20). He specifically pointed to a September 2020 physical evaluation by Examiner and his findings that Plaintiff had no additional upper extremity deficits, could "independently" climb on and off the examination table, and had "normal" neurologic findings,

including unassisted ambulation and normal gait, although unable to tandem walk. (*Id.* at 20-21 (citing *id.* at 342-44.)) He considered the treatment records by Neurology Fellow, Neurologist, and Neurology Specialist, including a July 2020 visit in which Plaintiff reported that his seizures had decreased from twice weekly to two or three times yearly since adjusting his medication,  and a March 2021 non-overnight hospital visit due to a seizure that indicated low levels of Keppra. (*Id.* (citing *id.* at 42-44, 61, 66, 331-32, 349-52.)) The ALJ also considered Plaintiff's elevated high blood pressure readings despite medication compliance and his reported dizziness and trembling secondary to increased dosages. (*Id.* at 20 (citing *id.* at 37, 39, 43, 207, 261, 264, 266-73, 275, 281, 283, 285, 288, 331, 334, 342-44, 349, 351, 355, 360.))

The ALJ further considered the December 2019 and October 2020 opinions of SAMCs Rowley and Herman, respectively, and their findings that Plaintiff had the RFC for light exertional work[20], except he could never crawl or climb ladders, ropes, or scaffolds, and never use the left upper extremity to lift and/or carry, push and/or pull, reach in all directions, handle, finger, and feel. (*Id.* at 21 (citing *id.* at 76-84, 86-96.)) He also noted that SAMC Herman further limited Plaintiff to avoiding "all exposure" to hazards such as machinery and heights and avoiding "concentrated exposure" to extreme cold and heat, wetness, humidity, noise, and "pulmonary irritants", such as fumes, odors, dusts, gases, poor ventilation.[21] (*See id.* at 21 (citing *id.* at 93.)) The ALJ expressly found the SAMCs' opinions "generally persuasive" to the extent that:

> [T]hey are commensurate with this determinable because a range of light exertion with non-exertional limitations of the left upper extremity as [] postural limitations are

---

[20] Although SAMC Rowley expressly Plaintiff to "medium" exertional activity, she also specifically limited him to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, which is substantially consistent with the definition of light work under the regulations. (*Compare* doc. 8-1 at 83, *with id.* at 80); *see* 20 C.F.R. § 404.1567(b), 416.967(b) (defining "light work", in part, as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").

[21] Although the ALJ's decision states that SAMC Herman also limited Plaintiff to avoiding exposure to vibration, she specifically rated his vibration limitation as "unlimited". (*Compare* doc. 8-1 at 21, *with id.* 93.)

consistent with the evidence of record showing left arm amputation below the elbow, generally well-controlled seizure disorder, unremarkable physical examinations in the treatment record, and minimal treatment overall for [Plaintiff]'s impairments. Based upon [his] seizure disorder and inability to use the left upper extremity, the record supports additional environmental limitations regarding hazards as a safety precaution against injury.

(*Id.* at 21.) Finding that the record did not include "acute complaints, abnormal clinical findings, or medical recommendation to support additional environmental limitations as to temperature, noise, and pulmonary irritants", the ALJ rejected those environmental limitations, however. (*Id.*)

Plaintiff contends that "it was error for the ALJ to develop the RFC in this particular case without an opinion from an examining medical professional" because "[t]he only medical opinions of record were provided by [SAMCs Rowley and Herman]". (doc. 14 at 9, 12.) "To the extent that [Plaintiff] is arguing that the ALJ may not rely on a non-examining physician's evaluation of a claimant's claims of disability, []he is incorrect." *Hill v. Berryhill*, 718 F. App'x 250, 255 (5th Cir. 2018). Rather, "[t]he ALJ may rely on [the SAMCs'] assessments so long as the[y] … [are] not 'the sole medical evidence presented' and as long as the [SAMCs] do[] not draw 'specific medical conclusions that either contradict or are unsupported by findings made by an examining physician'". *See id.* (citing *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990)). Here, the SAMCs' assessments were not the "sole medical evidence" presented and did not contradict the findings by examining physicians, including Examiner, who found that Plaintiff had a normal physical evaluation with normal range of motion, sensation, and gait, and was independently able to get on and off the examination table despite mild tenderness in the back and an inability to tandem walk. (doc. 8-1 at 21 (citing *id.* at 341-44)). The SAMCs' assessments also did not contradict the findings of the TDCJ and Parkland providers who, despite noting Plaintiff's "severe" burns, seizure disorder, and elevated blood pressure, found that he had normal physical examinations as early as April 2019 and as late as May 2021, and advised him to perform 30

minutes of aerobic on "most" days in August and September 2019, and to exercise "regularly" in December 2019. *See* doc. 8-1 at 37, 261, 273, 278, 307, 331; *see also Hill*, 718 F. App'x at 255 (finding that "the reports of [plaintiff]'s non-examining physicians were not the 'sole medical evidence presented' nor were they inconsistent with Dr. Gary's reported findings"). In addition, both SAMCs based their assessments upon a review of Plaintiff's medical records. *See* doc. 8-1 at 77-78, 81-82, 87-90, 93-94 (listing every medical record reviewed by each physician and her specific finding as to each record); *see also Nauman v. Comm'r of Soc. Sec.*, No. 1:20-cv-00144-HSO-JCG, 2021 WL 4096547, at *7 (S.D. Miss. Sept. 8, 2021) (noting that the SAMCs stated that their opinions were based upon a diligent review of Plaintiff's medical records and they did not contradict the reports of the examining physicians), *appeal dismissed sub nom. Nauman v. Kijakazi*, No. 21-60854, 2022 WL 1421052 (5th Cir. Feb. 24, 2022).

Because his RFC determination was based on specific medical opinions, the ALJ did not rely on his own lay opinion in violation of *Ripley*. *See Nauman*, 2021 WL 4096547, at *8 (finding that "the Magistrate Judge was correct in finding that the ALJ's denial was supported by substantial evidence because the ALJ properly relied on the non-examining physicians' opinions"). Remand is not required on this basis.

**B.  Physical RFC Determination**[22]

Plaintiff contends that the ALJ's decision is unsupported by substantial evidence, requiring remand. (doc. 14 at 12.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined

---

[22] Although Plaintiff does not list this issue, he briefs it within the section relating to his first issue. (doc. 14 at 10-12.)

"medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their

judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence because he rejected SAMC Herman's environmental limitations, which were supported by the record. (doc. 14 at 9-10.) He points to his hearing testimony that he should, among other things, avoid exposure to direct sunlight and chemicals because of his high blood pressure and seizures. (*Id.* (citing doc. 8-1 at 60.)) The ALJ did incorporate some of SAMC Herman's environmental limitations, specifically "hazards (machinery, heights, etc.)", into his RFC finding:

> Considering th[e] evidence in favor of [Plaintiff] supports a reduced but greater than basic range of exertional demands such as light work with no non-exertional use of the left upper extremity as well as postural and environmental restrictions such as *precluded vertical climbing as well as hazards or motor vehicle operation* to accommodate the loss of function as well as a safety precaution against dizziness and seizures.

(*Compare* doc. 8-1 at 21, *with id.* at 93.) Even if his testimony supports SAMC Herman's other environmental limitations, Plaintiff's "burden is not to highlight evidence contrary to the ALJ's ruling, but to show that there is no substantial evidence supporting the ALJ's decision". *Jones v. Saul*, 2021 WL 2895867, at *5 (N.D. Tex. July 9, 2021). An ALJ is not required to wholly adopt every limitation identified in a medical opinion, such as SAMC Herman's opinions relating to temperature, noise, and pulmonary irritants, if they are not supported by the evidence or are inconsistent with the medical evidence of record. *See Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021). Here, the ALJ specifically noted that "the record does not include acute complaints, abnormal clinical findings, or medical recommendation to support additional environmental limitations as to temperature, noise, and pulmonary irritants." (doc. 8-1 at 21); *see Webster*, 19 F.4th at 719 ("Though the ALJ neither adopted the state agency report verbatim nor accepted the

testimony of Dr. Small, it cannot be said that his decision was not based on substantial evidence or that he improperly applied the relevant legal standards."). The ALJ did not err when assessing Plaintiff's ability to perform work because he was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

Because "[t]he ALJ is solely responsible for determining a claimant's RFC, including whether to accept or reject medical opinions on a claimant's ability to perform work-related activities", he was free to discount SAMC Herman's opinions relating to temperature, noise, and pulmonary irritants based on a lack of supporting medical evidence of record. *See McCool v. Saul*, No. 3:19-CV-00393, 2020 WL 4905501, at *3 (S.D. Tex. Aug. 20, 2020), *report and recommendation adopted*, No. 3:19-CV-00393, 2020 WL 5518626 (S.D. Tex. Sept. 14, 2020) (citing *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012)). Ultimately, substantial evidence in the record supports the ALJ's finding that Plaintiff's medical conditions, including his left forearm amputation, restricted his RFC to light work with additional postural and manipulative limitations, as well as environmental limitations relating to unprotected heights, moving mechanical parts, and operating a motor vehicle. *See Greenspan*, 38 F.3d at 236 (noting that in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is not required on this basis.

## C. **Duty to Develop the Record**

Plaintiff contends that the ALJ's failure to develop the record and order a consultative examination was prejudicial error. (doc. 14 at 12.) The Commissioner responds that the ALJ assessed Plaintiff's RFC based on a "fully and fairly" developed record, including a physical

consultative examination. (doc. 16 at 15.)

The ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton*, 209 F.3d at 458 (citing *Ripley*, 67 F.3d at 557). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court "will reverse the ALJ's decision ... if the claimant shows that (1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff."[23] *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012) (citing *Brock*, 84 F.3d at 728). The duty to obtain medical records generally belongs to the claimant, however. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *7 (N.D. Tex. Mar. 25, 2011).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006). "An ALJ's duty to develop the record further is triggered *only when* there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (5th Cir. 2001) (emphasis added). A consultative examination is required "only if 'the record establishes that such an examination is *necessary* to enable the [ALJ] to make the disability decision'". *Barrett v. Berryhill*, 906 F.3d 340, 344-45 (5th Cir. 2018), *as revised* (Oct. 16, 2018) (emphasis in original) (citing *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016) (quoting *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam); *see Hardine v. Kijakazi*, No. 21-60226, 2022 WL 2070399, at *2 (5th Cir. 2022) (citing 20 C.F.R. § 404.1519a(b) to hold a consultative examination "may be

---

[23] "To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result." *Hardine v. Kijakazi*, No. 21-60226, 2022 WL 2070399, at *2 (5th Cir. 2022) (citing *Brock*, 84 F.3d at 728 (quotation omitted)).

required 'to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the agency] to make a determination or decision on [a] claim'").

In the Fifth Circuit, a consultative evaluation is not necessary when the record supports a conclusion that the claimant is not disabled. *See Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). Further, it is not required unless the record raises a "suspicion" concerning an impairment. *See Jones*, 829 F.2d at 526 (citing 20 C.F.R. § 416.1444). Isolated comments in the record about a claimant's impairment are not sufficient to raise a suspicion of an impairment. *See Pierre v. Sullivan*, 884 F.2d 799, 802-03 (5th Cir. 1989) (per curiam) (holding that "[a] few instances in the record noting diminished intelligence" were insufficient to raise suspicion that claimant was intellectually disabled) (citations omitted); *Brock*, 84 F.3d at 728 (holding claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, never sought medical treatment for such impairments, and did not mention these impairments at his hearing). Moreover, the duty to develop the record can be effectuated by the ALJ's questioning of the claimant regarding his education, training, past work history, the circumstances of his injury, daily routine, pain, and physical limitations, and providing an opportunity to add anything else to the record. *See Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) ("Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination.") (citing *Brock*, 84 F.3d at 728).

Plaintiff contends that had the ALJ ordered a consultative examination, the record would have included "conclusive evidence" to show that his diabetes, sleep apnea, and vision and back issues were not only medically determinable impairments, but "possibly" severe impairments that "should have been incorporated into the [ALJ's] RFC analysis and finding." (doc. 14 at 13.) In

reaching his decision at step two that Plaintiff's diabetes was non-severe and that his vision, sleep, and back issues were not medically determinable impairments, the ALJ expressly noted that despite Plaintiff's "longstanding medical history of diabetes" and treatment predating his application date, the record showed "the absence of acute diabetic complaints", which "suggest[ed] an asymptomatic impairment". (doc. 8-1 at 18-19; *see id.* at 260-363.) The ALJ also noted that Plaintiff's conservative and routine treatment had been limited to outpatient visits, medication management, and no ER visits or hospitalizations for "diabetic urgency" during the relevant period. (*Id.* at 19; *see id.* at 260-363.)) He noted the treatment notes and laboratory studies showing HgA1c levels "within the treatment goal" and found that they indicated "adequate control" and not "significant functional interference". (*Id.* at 19; *see id.* 260-363.) Although Plaintiff alleged poor vision, needing glasses, and an inability to purchase them because he lacked insurance, the ALJ noted that Plaintiff's medical records showed that he denied vision symptoms, had normal eye findings, and complained of blurry vision only during seizures. (*Id.* (citing *id.* at 57, 61, 305-06, 349.)) As to his sleep issues, the ALJ found that "[r]elated acute complaints, treatment, and abnormal findings" were absent from the record. (*Id.* at 19.) The Appeals Council considered his additional medical evidence, including a May 2021 visit with Parkland Sleep Center during which he was assessed with "[p]ossible [obstructive sleep apnea] symptoms" and referred for a home sleep apnea study, and found that it did not show a "reasonable" probability that it would have changed the outcome of the ALJ's decision. (*Id.* at 5, 39.) Furthermore, while he alleged back issues and use of a back brace on the second function report, he did not mention it at the hearing or on his first function report and had only one documented instance of mild tenderness in the back during the relevant time period. (*See id.* at 200-07, 220-27, 260-363.) Notably, he alleged left amputated arm, high blood pressure, seizures, and diabetes as a basis for disability, but not sleep

apnea or problems with his vision or back. (*See id.* at 193.)

The ALJ considered a medical record that was over 300 pages and included over 3 years of treatment notes from Plaintiff's treating and examining physicians, the medical records from TDCJ, Fort Worth Internal Medicine, and Parkland, and the opinions of the SAMCs. (*Id.* at 260-363.) There is no indication that the evidence before him was ambiguous, inadequate, inconsistent, or that he lacked sufficient facts upon which to make a disability decision. *See Hardine*, 2022 WL 2070399, *2; *Mayes*, 276 F.3d at 459-60. Instead, "[a]fter careful consideration of all the evidence", the ALJ concluded that Plaintiff could perform "a range of light exertion[al] [work]" with postural, manipulative, and environmental limitations, which he found were "consistent with the evidence of record" showing a left forearm amputation, "generally well-controlled" seizure disorder, "unremarkable" physical examinations, and "minimal treatment overall" for his impairments. (doc. 8-1 at 21.) In addition, the ALJ expressly asked at the hearing whether he wanted to add anything else, and Plaintiff declined. (*Id.* at 67.) Although Plaintiff argues that a consultative examination was required, (doc. 14 at 13 (citing doc. 8-1 at 90)), the ALJ was not required to order one because substantial evidence supports his RFC determination. *See Smith v. Berryhill*, No. CV H-18-2490, 2019 WL 3557586, at *9 (S.D. Tex. July 11, 2019), *report and recommendation adopted*, No. CV H-18-2490, 2019 WL 3548850 (S.D. Tex. Aug. 5, 2019) (finding that the ALJ was not obligated to order a consultative examination).

Because Plaintiff has not alleged that the record raises a "suspicion" concerning any other impairment, (*see* doc. 14), he has not shown that a consultative examination was necessary, *see Jones*, 829 F.2d at 526. As noted, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The ALJ fulfilled his duty to fully and fairly develop the record, and a consultative examination was not required.

## D.  **Conflict with the DOT**[24]

Lastly, Plaintiff contends that the VE's testimony on the less than 8,000 jobs that he "may" be able to perform "conflict[ed] with the [DOT]". (doc. 14 at 11.) He specifically argues that there was "no testimony" on the impact that environmental limitations would have on the availability of the "already limited number of jobs." (*Id.*)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including the DOT (and its supplement, the SCO[25]) and VEs, to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. May 21, 2009). The DOT and the SCO "comprise a comprehensive listing of job

---

[24] Although Plaintiff does not list this issue, he briefs it within the section titled "Relevant Hearing Testimony" and within the section relating to his first issue. (doc. 14 at 4, 11.)

[25] SCO stands for Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles.

titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs." *Duncan v. Saul*, No. 3:19-CV-1333-S-BH, 2020-WL 6120472, at *13 n.8 (N.D. Tex. Sept. 10, 2020), *report and recommendation adopted*, No. 3:19-CV-1333-S-BH, 2020 WL 6064359 (N.D. Tex. Oct. 14, 2020). The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." *See* SSR 00-4p, 2000 WL 1898704, at *2. She may also rely on VEs, who assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may rely on the testimony of a VE in response to a hypothetical question[26] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). SSR 00-4p[27] requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* 2000 WL 1898704, at *1-2. As part of his duty to fully develop the record, the ALJ has an "affirmative responsibility"

---

[26] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)). A hypothetical question posed to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436.

[27] Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *See* SSR 00-4p, 2000 WL 1898704 (S.S.A. 2000). SSRs represent "statements of policy and interpretations" adopted by the SSA that are "binding on all components" of the SSA. *See* 20 C.F.R. § 402.35(b)(1). While binding on the SSA, these interpretive rulings are not binding on the courts and need not be given the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam). Courts may "rel[y] upon the rulings in evaluating ALJs' decisions", however. *Myers*, 238 F.3d at 620.

to inquire of the VE on the record whether there is such an inconsistency. *Id.* at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

As discussed, the ALJ asked the VE whether the first hypothetical individual of Plaintiff's age, education, and RFC (i.e., light work limited by postural, manipulative, and environmental limitations, such as never working at unprotected heights, moving mechanical parts, and operating a motor vehicle) could perform other work in the national economy. (doc. 8-1 at 68.) The VE initially responded that "when one is working one handed, the pace of work is far less", but at the ALJ's request, she testified about the light, unskilled jobs of escort (DOT 359.367-010), chaperone (DOT 359.667-010), and usher (DOT 344.677-014). (*Id.* at 68-74.)

The VE testified that an escort existed with 1,400 jobs nationally and was defined by the DOT as "*driving visitors* and industrial [sic], who are coming to certain destinations in industrial establishments" and "escorting somebody to an office [or] a department". (*Id.* at 69-70, 73.) She also testified that she "question[ed]" whether an escort was a "stand-alone occupation" because driving and escorting visitors could be performed by a receptionist or another employee as "part of his duties", including delivering messages or mail, which may require carrying and/or lifting more than 10 pounds. (*Id.* at 73.) She further testified that the DOT defined a chaperone as an individual who "[c]haperones young people to social functions held in hotels or restaurants, greets guests, answers questions regarding programs, arranges for entertainment such as games, concert[s], motion pictures, asks guests to observe rules of establishment and report[s] to vendors [and] officer[s]" and "may collect tickets for admission to events". (*Id.* at 70-71.) Although she confirmed the DOT's national number of chaperone jobs and the job's consistency with the hypothetical, she added, "*I really question whether it exists in the national economy*", and "*I don't think I've ever seen a job title for that* in terms of placement for purposes of placement." (*Id.*) After

the ALJ likened a chaperone to an usher and asked whether the two were the same position, the VE responded that an usher (DOT 344.677-014, light, SVP-2), of which there were 4,500 jobs nationally and which performed occasional "manual dexterity", could be performed one-handed because it involved "more standing and walking" than "holding programs". (*Id.* at 71, 73.) Relying exclusively on the VE's testimony, the ALJ found that, despite Plaintiff's limitation to one upper extremity, he was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy", including as an escort, chaperone, and usher. (*Id.* at 23; *see id.* at 68-74.)

Although the ALJ specifically asked the VE whether there was a conflict between the DOT and her testimony, he neither identified nor obtained a reasonable explanation for the various "apparent conflicts" between the two relating to Plaintiff's ability to perform as an escort or as a chaperone. (*See id.* at 22-24.) There appears to be conflict between the DOT's description of an escort and the VE's questioning of whether it was still a stand-alone occupation, as well as the DOT's number of chaperone jobs nationally and the VE's questioning of whether it existed in the national economy and not recalling having ever seen it for purposes of placement. (*Id.* at 68-74.) There is also an inconsistency between Plaintiff's RFC environmental limitation that precluded him from operating a motor vehicle and the DOT's description of an escort as driving visitors. (*See id.* at 20, 68-74.) Courts have recognized that when an ALJ elicits testimony from a VE, he cannot ignore it without explanation. *See Avalos v. Colvin*, No. EP-14-CV-97-ATB, 2016 WL 1583677, at *5 (W.D. Tex. Apr. 19, 2016) (citing cases); *Elders v. Apfel*, No. 3-98-CV-1602-BD, 1999 WL 61398, at *6 n.2 (N.D. Tex. Jan. 28, 1999) (noting that the ALJ could not ignore the VE's testimony that the plaintiff could not perform past work or other work after eliciting testimony on the issue); *see also Rodriguez v. Barnhart*, No. Civ.A. SA01CA1101FB(N), 2003 WL 1956230, at *9 (W.D.

Tex. Mar. 21, 2003) (finding that the ALJ erred in failing to discuss the VE's testimony that the plaintiff would have problems performing other work after the plaintiff's attorney "cast serious doubts" on the "plaintiff's ability to maintain employment and properly perform in those jobs"). While the ALJ relied on the VE's testimony in determining the existence of other work, he did not discuss the several instances that her testimony cast doubt on Plaintiff's ability to perform as an escort or chaperone. (*See* doc. 8-1 at 23-24.); *see Rodriguez*, 2003 WL 1956230, at *9.

The Commissioner does not dispute Plaintiff's contention or argue that he waived it by not listing it. (*See* doc. 16.) Even though the VE did not testify that either the escort or chaperone jobs would be impossible, she specifically "question[ed]" several aspects of the escort and chaperone jobs. (*See id.* at 23-24.) Notably, the ALJ, not the VE, suggested all the job titles that the VE discussed; at best the VE opined that Plaintiff could perform as an usher, and at worst, she cast doubt on his ability to perform as an escort or a chaperone. (*Id.*) Without explanation, it is unclear why the ALJ did not consider those portions of the VE's testimony in determining that Plaintiff could perform other work, and his "decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455.

Because the ALJ relied on the VE's testimony but did not explain why he did not consider the VE's statements relating to the definition and/or existence of escort and chaperone jobs in making his step five determination, his decision was not based on substantial evidence. *Elders*, 1999 WL 61398, at *6 (finding that the ALJ's decision was not supported by substantial evidence, in part, because it provided no explanation for ignoring the VE's testimony).

**E.  Harmless Error**

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are

affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the VE's testimony was "actually inconsistent with the DOT" and could have resulted in a different decision. *See Graves*, 837 F.3d at 592-93 (applying a harmless-error standard when the ALJ erred by failing to ask the VE if her testimony was consistent with the DOT).

Here, the ALJ determined that Plaintiff could work as an escort, chaperone, and usher exclusively based on the VE's testimony. (doc. 8-1 at 23.) As discussed, there was a lack of substantial evidence to support the determination because the VE specifically stated that she questioned whether the chaperone job existed in the national economy and whether the escort job existed as a stand-alone occupation, and the ALJ failed to obtain her testimony on whether Plaintiff could perform work as an escort despite his preclusion from driving. (*Id.* at 70.) Plaintiff was prejudiced by the ALJ's reliance on the VE's testimony in finding that he could perform other work without discussing or explaining why he disregarded these portions of the VE's testimony; if he had considered that testimony or requested the necessary testimony, it is possible that he might have determined that Plaintiff could not perform other work. As noted above, without explanation, it is unclear why the ALJ did not consider this position of the VE's testimony or what affect its consideration would have had on the decision. It is possible that consideration of the VE's testimony would have caused the ALJ to make a different determination regarding Plaintiff's

ability to perform other work that existed in significant numbers in the national economy. The ultimate determination, however, will be made on remand. Accordingly, Plaintiff has demonstrated that he was prejudiced and that a substantial right has been affected. The error is therefore not harmless, and remand is warranted on this issue.

### IV.   CONCLUSION

The Commissioner's decision is **REVERSED in part**, and the case is **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED** on this 28th day of November, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE